## THE PLEASURE BAY.

### (District Court, S. D. Alabama, S. D.   July 31, 1915.)

### No. 1474.

1. SALVAGE ⬡1—NATURE AND GROUNDS.

"Salvage" is the reward allowed for service to marine property, at risk or in distress, rendered by one under no legal obligation to do so, resulting in benefit to the property, if saved.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 1, 3, 4;  Dec. Dig. ⬡1.

For other definitions, see Words and Phrases, First and Second Series, Salvage.]

2. SALVAGE ⬡7—NATURE OF SERVICE.

Useful service of any kind to a vessel, exposed to any impending danger and imminent peril of loss or damage, as towing her from a dock where she is in imminent danger of catching fire, or assisting to extinguish a fire on her, entitles those rendering it to salvage.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 13, 16, 26;  Dec. Dig. ⬡7.]

3. SALVAGE ⬡26—AMOUNT—ELEMENTS IN DETERMINATION.

Elements to be considered in determining amount of salvage are labor expended in the service, promptitude, skill, and energy displayed therein, value of property employed therein and danger to which it was exposed, risk incurred by the salvors, value of property saved, and degree of danger from which it was rescued.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 57–64, 68, 84;  Dec. Dig. ⬡26.]

4. SALVAGE ⬡1—THEORY AND PURPOSE.

Salvage is not viewed by the admiralty courts merely as pay, but as a reward, allowed from motives of public policy.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 1, 3, 4;  Dec. Dig. ⬡1.]

5. SALVAGE ⬡31—AMOUNT AND APPORTIONMENT.

Under the facts, where a vessel, on fire from burning buildings, was hauled from the wharf into the river, and another tug then assisted in extinguishing the fire, *held*, 5 per cent. of her value should be awarded as salvage, two-thirds thereof to the tug, which did the hauling, and her crew.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 75–77;  Dec. Dig. ⬡31.]

In Admiralty.   Libel by the Lapwing Towing & Wrecking Company against the steamer Pleasure Bay for salvage.   Decree for libelant.

Hanaw & Pillans, of Mobile, Ala., for libelant.
Sullivan & Stallworth, of Mobile, Ala., for claimant.

TOULMIN, District Judge.   [1] Salvage is the reward allowed for a service rendered to marine property, at risk or in distress, by those under no legal obligation to render it, which results in benefit to the property, if eventually saved—among others, the following services, viz.: Saving a vessel from fire, either aboard or in dangerous proximity. Removing a vessel from any impending danger.   Hughes' Admiralty, 127, 128, 129;  The Blackwall, 10 Wall. 1, 19 L. Ed. 870.

⬡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

[2] Useful services of any kind, rendered to a vessel exposed to any impending danger and imminent peril of loss or damage, entitles those who render such services to salvage reward. Persons assisting to extinguish a fire on board a vessel, or towing a vessel from a dock where she is in imminent danger of catching fire, are entitled to salvage compensation. Authorities cited supra. The United States Supreme Court, in The Blackwell, supra, said:

"Steam vessels are considered as entitled to a liberal reward, not only because the service is usually rendered by a costly instrumentality, but because the service is in general rendered with greater promptitude and is of a more effectual character."

In case of fire, the first moments are the most important.

[3] Elements to be considered in case of salvage service are: The labor expended by the salvors in rendering the service. Promptitude, skill, and energy displayed in rendering the service and saving the property. The value of the property employed by the salvors, and the damage to which such property was exposed. The risk incurred by the salvors in securing the property from the impending peril. The value of the property saved. The degree of danger from which the property was rescued. The Blackwall, 10 Wall. 1, 19 L. Ed. 870.

The steamboat Pleasure Bay was moored at the dock of the Gulf Dry Docks Company, on the west side of the Mobile river in the city of Mobile. She was lying in the river at the east end of, and next to, the wharf with bow upstream. There was no steam up and no crew on her, only a watchman aboard. He was present when the fire occurred at the Gulf Dry Docks Company's property, and was below decks in the fire room at the time. There was no one there but himself, and he got in a skiff and went to look for a tugboat. When he got back, the tug Dawn was putting two tugboats—the Isabel and the Nimrod—along by the Mobile Coal Company's docks, about 600 or 700 feet further up the river, and the Linnet was pulling the Pleasure Bay. This was about 6 or 7 o'clock in the evening.

The buildings of the Gulf Dry Docks Company, at the west end of the wharf, were afire, 75 or 100 feet distant from the Pleasure Bay, with light west or northwest wind blowing. The tide was slack, and there was very little or no current. The heat from the burning buildings was intense, and was being blown by the wind towards the Pleasure Bay. In the meantime some 8 or 10 men had assembled there, and, observing the perilous position in which said steamer appeared to be, went aboard of her and made an effort to turn her loose from the wharf, in which they were unsuccessful. It appears that at that time there were two tugs lying on the outside (starboard side) of the Pleasure Bay, without crew and without steam, but fastened by line to the Pleasure Bay, and the tug Dawn, belonging to the owner of said two tugs, came to their relief and rescue, and towed them away and out of danger. In this service the Dawn made an effort to tow the Pleasure Bay away at the same time, but succeeded in moving her only a very short distance and abandoned the effort, proceeding up the river with the two tugs as hereinbefore stated. The Pleasure Bay drifted back into her former position, having been moved but a few feet therefrom. She was then afire near the back end of the cabin, and life preservers

and some other parts of the boat were also afire. The 8 or 10 men on board were doing what they could, with such means as were at hand, to extinguish the fire. The heat became so intense on that side of the boat nearest the fire ashore that the men were forced to abandon their work there and continue their efforts on the other side of the boat.

These were the conditions when the tug Linnet was seen approaching from up the river, and was hailed and informed that the Pleasure Bay was afire. Said tug came at once to her relief, backed up sufficiently near the steamer to cast a line on her, which was made fast by those aboard of her about amidships, or a little forward of the wheelhouse, and the Linnet pulled her out into the river, about the middle of the river, according to the weight of the evidence. The evidence as to the steamer being in the middle of the river when the Dawn returned was controverted by the claimant. This, however, is immaterial, as it is undisputed that the Linnet had pulled the Pleasure Bay out into the river far enough to remove her from her perilous position and beyond the reach of the flames ashore, and made it possible not only for the men aboard of her to continue their efforts to extinguish the fire on her, free from the intense heat experienced by them from the fire ashore while at the wharf, but also possible for the tug Dawn, on her return to the Pleasure Bay, to go along her port side, that nearest the wharf, without being exposed to the intense heat which came from the fire ashore, and to the risk of the Dawn herself being fired, and to enable her to use her water power and fire apparatus with effect, as she did.

Captain Hogan, of the Dawn, witness for claimant, testified that he pulled the Nimrod and Isabel away and took them about 150 feet and he thinks it took about 8 or 10 minutes, and came back to the Pleasure Bay. The Linnet had a line on her, and had pulled her a little away from the wharf—about the length of the steamer, but he did not know her length exactly. Witness stated that he tried to pull the Pleasure Bay away when he took the two tugs, but failed. The watchman of the Pleasure Bay, witness for claimant, stated that he saw the Dawn putting the Isabel and Nimrod along the Mobile Coal Company's dock, up the river about 600 or 700 feet. She came back, and came up between the Pleasure Bay and the wharf, and stayed on the port side about 10 or 15 minutes, and had a stream on the Pleasure Bay from the wheelhouse aft. There was other evidence which tended to show that from the time the Dawn left with the two tugs from their position by the side of the Pleasure Bay until her return was some 20 minutes or more, and that during her absence the Linnet had come, backed up within a few yards of the Pleasure Bay, fastened a line to her, and pulled her out to a position in the river free from serious impending danger from fire ashore, and that made the efforts of others available to extinguish the fire on her. This was done by the Linnet before the Dawn returned. There was an absence of any other assistance at the time the Linnet came than that of the men on the steamer. The services rendered by the Linnet were prompt, meritorious, and efficient. They were effective in relieving the steamer from danger, which was not only reasonable to be apprehended, but was, in my opinion, from the evidence, actually present.

There was no particular danger to the Linnet or crew involved; but assistance rendered at a time most needed is an important element, and should be taken into account in ascertaining the salvage award. The undisputed value of the Pleasure Bay was $15,000, and that of the Linnet $1,800.

[4, 5] As I view the case from the evidence, there can be no serious contention that it is not a salvage case. The real controverted question is the amount of the award to be allowed. There was no special actual outlay of labor and expense used in the enterprise; no items shown from which a computation can be made. There are otherwise no fixed rules by which awards are made. The courts grant such a sum in reward as they deem proper. They ascertain the value of the property saved, and in general adopt the practice of measuring the amount of the rewards by some proportion of the aggregate value of the property saved. The question is often a perplexing one; there being so many elements, in which salvage consists, to be considered.

It appears that the Linnet was engaged in the service rendered by her about 25 or 30 minutes, and that the Dawn was occupied in the service rendered by her in the extinguishment of the fire about 10 or 15 minutes. When the fire was extinguished, the Linnet transferred her towline to the Starling, another tug of libelant, which was standing by, and by her towed further up the river to a wharf where she was left.

"Compensation as salvage is not viewed by the admiralty courts merely as pay, but as a reward given as a bounty, allowed from motives of public policy, for services voluntarily rendered, and as an inducement to seamen and others to embark in such undertakings to save life and property." The Blackwall, supra; The San Cristobal (D. C.) 215 Fed. 615; The Knickerbocker (D. C.) 218 Fed. 524; The Neshaminy (D. C.) 220 Fed. 182; The Key West (C. C.) 11 Fed. 911.

The case of The Key West, supra, is very like the case at bar in its facts and circumstances.

My opinion is that 5 per cent. on the value of the Pleasure Bay would be fair and reasonable compensation for the salvage services rendered her; and my judgment is that the tug Linnet is entitled to the greater part of the award, to wit, $500, for said tug and crew, for which a decree is hereby ordered, and to be apportioned by the owners of said tug.